IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| **BRIAN W. COLLISTER,** | § | |
| | § | |
| PLAINTIFF, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 1:19-CV-00350-LY |
| | § | |
| **KXAN-TV, NEXSTAR MEDIA GROUP, INC.,** | § | |
| **CHAD CROSS, INDIVIDUALLY,** | § | |
| **ERIC LASSBERG, INDIVIDUALLY, AND** | § | |
| **CATHERINE STONE, INDIVIDUALLY,** | § | |
| | § | |
| DEFENDANTS. | § | |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR HEARING
FOR POSSIBLE DISQUALIFICATION OF OPPOSING COUNSEL**

Defendants KXAN-TV, Nexstar Media Group, Inc., Chad Cross, Individually, and Eric Lassberg, Individually, file this their Response to Plaintiff's Motion for Hearing for Possible Disqualification of Opposing Counsel and show the Court as follows:

**I.
THE SCOPE OF THIS PROCEEDING AND RELEVANT EVIDENCE**

There is no dispute in this case that Collister agreed to arbitrate his claims. He did not file suit and have to be compelled to arbitration. With able counsel who diligently represented him, he chose to file a demand for arbitration with the American Arbitration Association. He agreed to the arbitrator and agreed to be bound by the decision. He was not happy with the arbitrator's award, so he filed a pro se lawsuit seeking to start from scratch and re-litigate all of his claims.

In determining what evidence (and witnesses) are relevant in this case, it is important to consider the limited standard of review. "The court is to give deference to the arbitrator's decision and review of an arbitration award is 'extraordinarily narrow.'" *McVay v.*

*Halliburton Energy Servs., Inc.*, 688 F. Supp. 2d 556, 560 (N.D. Tex. 2010) (quoting *Glover v. IBP, Inc.*, 334 F.3d 471, 473-74 (5th Cir. 2003)). Indeed, "[t]he standard of review for arbitration awards has been described as 'among the narrowest known to the law.'" *Mantle v. Upper Deck Co.*, 956 F. Supp. 719, 726 (N.D. Tex. 1997) (quoting *ARW Exploration Corp. v. Aguirre*, 45 F.3d 1455, 1462 (10th Cir. 1995)). A court may not vacate the arbitrator's award except to the extent it was procured by fraud or when the arbitrator was guilty of corruption or misconduct or exceeded the scope of her powers. *See* 9 U.S.C. § 10; *Citigroup Global Mkts., Inc.*, 562 F. 3d at 358 (citing *Burchell v. Marsh*, 58 U.S. 344, 349 (1854)). Collister is asking this Court to view the arbitration as a "prologue to prolonged litigation," which the case law makes clear is not proper. *See Choice Hotels Intern. v. SM Prop. Mgmt.*, 519 F.3d 200, 212 (4th Cir. 2008).

## II. COLLISTER ILLEGALLY RECORDED AN ATTORNEY-CLIENT PRIVILEGED CONVERSATION

Collister made over 70 secret recordings in the workplace in Texas. Texas is a "one party" consent state, meaning that if Collister was a party to the conversation, he could record it. Some of his recordings capture conversations of coworkers where it does not appear that he was a party. But with respect to the one at issue in his motion, it is undisputed that he was not a party to the conversation.

Specifically, KXAN's General Manager, Eric Lassberg, and News Director, Chad Cross, were seeking legal advice from outside counsel (the undersigned) and Nexstar's Associate Counsel and SVP Human Resources, Terri Bush. Mr. Lassberg was speaking with Mr. Davis and Ms. Bush on a speaker phone in Mr. Lassberg's office and the door was closed. Unbeknownst to the parties to this conversation, Collister was outside the door with his secret recorder running. When Defendants learned that Collister was going to offer this recording into evidence in the arbitration, counsel sent a cease and desist letter explaining how (1) making the recording was

illegal, and (2) attempting to use the recording was yet another violation of the Texas Penal Code. (Exhibit A).

Moreover, what was said in an attorney-client privileged conversation was not material to the fundamental elements of Collister's claims in the arbitration. Collister testified for three- and one-half days of a five-day arbitration. He admitted away most of the elements of his claims, and was not credible on others. His inappropriate behavior during the arbitration such as sleeping in the back of the conference room while witnesses were testifying and chewing on a fishing lure to distract counsel during cross examination likely hurt his credibility.

Although the Arbitrator did not need to consider what was said in the attorney-client privileged conversation, she did. Specifically, there were two pieces of evidence offered by Collister: (1) The illegal recording Collister made of an attorney-client privileged conversation; and (2) an exhibit containing statements Collister typed from either his recollection of overhearing the conversation or from listening to the illegal recording. The arbitrator admitted into evidence the document but would not admit the recording. The following was the discussion on the record:

> Evidentiary Hearing Vol. 2, (Pages 206:18 to 216:9)
>
> 206
>
> 18  You sat down in the lobby. You had turned on
>
> 19  your recorder thinking that you were going to have an
>
> 20  opportunity to meet with Mr. Lassberg?
>
> 21     A   My intention was to record the conversation
>
> 22  with Mr. Lassberg, just as I had been doing for weeks,
>
> 23  months with all of the management.
>
> 24     Q   But you also described a conversation that you

25  overhead.  I think you described it, loud as a Led

      207

1  Zeplin concert?

2    A   Yes, it was.

3    Q   You identified that you heard Mr. Cross,

4  Mr. Lassberg, and Mr. Davis?

5    A   Yes.  I did not hear Ms. Bush.

6    Q   You subsequently discovered, is it true, that

7  that conversation on speakerphone was picked up by your

8  phone?

9    A   At the time I did not realize it because it

10  was deep inside my jacket.  In fact, I didn't believe

11  that it would pick it up.  It's just an iPhone.  It is

12  like an iPhone 5 or something.

13        So I immediately, when I realized that

14  they were colluding to fire me, I could hear it, I took

15  my phone out, opened up my notes and started to write

16  what was being said as quickly as I could, because I was

17  under no impression that it could be picked up, or that

18  it was being picked up.

19        It wasn't until this summer when we were

20  going through the audio tracks and I was logging the

21  soundbite with Mr. Lassberg, that I listened to it and

22  realized that you could hear them talking about setting

23  me up to be fired.

24      And accusing me of being unethical, when

25  I wasn't. And strategizing how to fire me and not make

                208

1  it look like it was retaliation for ADHD or the

2  arbitration.

3     Q   Was there one particular portion of the

4  recording that you identified for the purposes of

5  today's arbitration?

6     A   I believe there were two.

7       MR. SANCHEZ: Your Honor, I know Mr. Davis

8     has an objection, should probably take it up.

9       But at this point I would like to prep to play

10    that soundbite.

11      MR. DAVIS: It doesn't matter what his

12    original intent was. Once he turned on the

13    recorder, once he realizes he is not a party to

14    this conversation and he is recording when he

15    is not a party, it is illegal.

16      It is a crime to record it. It is a crime

17    to transmit it. And it's a crime to use it.

18      There has already been two violations of

19    the Texas Penal Code. We are trying to prevent

20    another one here.

21    Counsel knows this is unethical to do

22    this.  I raised it in the deposition that

23    Mr. Collister indicated that he didn't have

24    that recorded.

25        We first learned that that was actually

            209

1    recorded last week, when counsel designates a

2    portion of the recording.

3        And we provided the Arbitrator with case

4    law that makes it crystal clear.  Mr. Collister

5    was not a party to this conversation.  It was

6    illegal.  And it is not admittable.

7        MR. SANCHEZ:  Your Honor, this issue came

8    up on June 26th, 2018, during Mr. Collister's

9    deposition.  Mr. Davis asked Mr. Collister

10    about his recordings.

11        And as you have seen in the course of this

12    arbitration, he was as transparent as the day

13    is blue outside.  He was very clear, the

14    recitation you heard today is what he explained

15    to Mr. Davis in his deposition under oath as it

16    happened.

17        Mr. Davis said nothing about it, other

18    than to ask questions about it.  Until this

19    morning, I think, I received a Cease and Desist

20    letter with a threat for going to the FBI, or

21    filing suits, or whatever he said.  I haven't

22    actually read the letter.

23        MR. DAVIS:  That's not what I said.

24        MR. SANCHEZ:  I will produce it to you so

25    you can read it for yourself.  I noticed he

           210

1    didn't copy the AAA that you received a copy of

2    the letter.  So I will be sure to forward it to

3    you.

4        But since June 26th, we went through July,

5    August, September, October, I never heard a

6    word from Mr. Davis.  I really didn't hear much

7    from him about anything.  But I certainly

8    didn't hear about this recording, which he knew

9    about and he has known about.

10        In fact, yesterday, Your Honor, you asked

11    the question, Is there any the briefing.  I

12    thought the same thing.

13        If someone has an issue that implicates

14    the penal code and all sorts of other potential

15    violations, you would think that a diligent

16    lawyer would raise that issue and file some

17  sort of Motion in limine to keep it out.  That

18  wasn't done.

19     Your Honor, we held a telephone conference

20  with you last week, in which the issue of the

21  recordings was raised and discussed.  And I

22  don't think Mr. Davis made that particular one.

23     If I remember correctly, I think it was

24  Mr. David Scott who appeared.  And Mr. Scott

25  asked, I want a copy -- If it was him, asked, I

                211

1   want a copy and a breakdown of the recordings

2   that we intend to use.

3      This particular -- not this particular.

4   All the recordings have been designated by me

5   and Mr. Collister since, I think May, May or

6   June, when we identified the existence of those

7   recordings.

8      So after conferring with you, Your Honor,

9   you directed us to, Produce a list of the

10  snippets you intend to use with the date stamp

11  and the timestamp, which we have done.

12     The particular snippets was included at

13  the request of counsel in the summary.  So here

14  we are on the second day of the arbitration,

15  and there's a delayed and dilatory objection to

16  recordings that they have been in possession of

17  for months.

18      Now, I strongly disagree with Mr. Davis'

19  intention that this was intentional.

20  Mr. Collister just stated he had no intention

21  of recording, didn't know that the recording

22  was picking up the conversation.  He was there

23  to have a conversation with Mr. Lassberg, which

24  he was requested to attend in that office

25  conference.

                    212

1      So I think the recordings, whether

2  Mr. Davis thinks there is an issue, they are

3  admissible.  Just because there is an issue

4  regarding whether or not he thinks

5  Mr. Collister was present or not present, or a

6  party, they are otherwise admissible.

7      And let me get back to the opening

8  comments Mr. Davis made yesterday, which is, we

9  are in an arbitration.  He made it a point to

10  request that you remind and direct the parties

11  that this is private.  It is confidential.  It

12  is not public.  And I agreed.

13    I said, Your Honor, I'll abide by your

14    ruling, but nothing that was said here today or

15    in the course of this arbitration will be

16    repeated.

17       You know, it is a two-way street.  If you

18    want secrecy and privacy, then you get it.

19    That's what's afforded.

20       So what is the prejudice, other than

21    Mr. Davis making collusive statements that

22    don't reflect well on him about what they are

23    going to do to Mr. Collister.

24       What is the prejudice?  It all stays here

25    in this conference room.

        213

1     ARBITRATOR STONE:  Are we talking about

2     two sentences?

3     MR. SANCHEZ:  Yes, Your Honor.

4     ARBITRATOR STONE:  Do you have that

5     listing?

6     MR. DAVIS:  I need it.  Was that --

7     MR. SANCHEZ:  What we sent --

8     ARBITRATOR STONE:  Does this help you?

9     MR. DAVIS:  Yeah.  I mean, we are still

10    going to object.  There was a discussion in a

11  break, while fighting through a lot of other --

12  Mr. Collister's shenanigans during his

13  deposition and inappropriate behavior where I

14  made it very clear, this is an illegal

15  recording.

16  Ms. Bush was there. I don't recall if she

17  chimed in, but it was an illegal recording. We

18  made our position very clear.

19  To-date I have gotten zero cooperation on

20  reigning in Mr. Collister's behavior. He has

21  not addressed the fact that Mr. Collister was

22  not a party to that conversation. There is no

23  dispute that he wasn't a party.

24  It doesn't matter if he placed a device in

25  the room, outside the room, down the hall, he

214

1  was not a party to that conversation. And it

2  is illegal.

3  You know, I think if -- even if that quote

4  comes in, I think it is prejudicial. I don't

5  know if it would completely cure the prejudice.

6  But if we could amend our answer to

7  include a defense of after-acquired evidence

8  saying that per his contract, he can be

9   terminated for an illegal act, it might help.

10   But I don't think it would cure the

11   prejudice. And I don't think it would get past

12   the very clear case law that says it is not

13   admissible.

14   MR. SANCHEZ: If I could respond?

15   ARBITRATOR STONE: Sure.

16   MR. SANCHEZ: I do, for once, agree

17   whole-heartly with Mr. Davis on one point.

18   That is, it is prejudicial. It is very

19   prejudicial. It is prejudicial to Mr. Davis in

20   what he was trying to do.

21   And the fact that Mr. Collister was still

22   an employee, and this management was

23   ostensively supposed to be working with him to

24   remediate his position, and they are not doing

25   that.

215

1   This is all for your eyes to make him look

2   bad. So he can sit there and refer to his

3   shenanigans and whatnot. It is just a

4   continuing pattern.

5   Let's talk about what actually happened.

6   There's a lot of lawyers in this room. And I

7    can tell you one thing that I don't do when I

8    speak to my clients, I certainly don't say, Put

9    me on speakerphone with a roomful of people --

10       ARBITRATOR STONE:  We are going to stop

11   right there, because we don't need to.  These

12   two sentences are not going to change my mind

13   in your favor or in yours.

14       Under the circumstances, I think it's

15   safer for all involved that this not come in,

16   because there is a big question about whether

17   it was legally recorded.  So this will not come

18   in.

19       And I can tell you, in all honesty, it is

20   not a nonissue because it will not change my

21   mind one way or the other.

22       There's a lot here, and I'm going to make

23   my mind up on a lot here, but I don't need

24   this.

25       MR. DAVIS:  I think that's fair.  I think

                          216

1    you would instruct a jury on what the lawyer's

2    say is not evidence and doesn't matter.  I

3    think that's a fair assessment --

4        ARBITRATOR STONE:  It is not going to

> 5    favor you, and it is not going to favor you.
>
> 6    It is a neutral.  So let's move on.
>
> 7    MR. DAVIS:  Fair enough, Judge.
>
> 8    MR. SANCHEZ:  Thank you, Your Honor.
>
> 9    Thank you for listening to us.

Even though the recording itself was not admitted into evidence, an exhibit purportedly quoting from either Collister's recollection from eavesdropping or his listening to the illegal recording was admitted into evidence.  Specifically, Exhibit 43 is a Performance Improvement Plan Progress Update KXAN gave Collister outlining things he needed to do remain employed. Instead of simply working on doing those things like meeting important deadlines to get stories on the air for the Super Bowl and Olympics, Collister wrote back a long-winded diatribe refusing to commit to deadlines.  He typed in bold red and underlined type –

**"\*\*\*<u>Direct quotes from KXAN's attorney to GM Eric Lassberg and ND Chad Cross, "What you're looking for are performance issues with no connection to ADHD, this is our biggest opportunity" and "Everything from here on is for the arbitrator who can think – wow this guy is unreasonable."</u>**

So, despite the ruling on the admissibility of the recording, the Arbitrator admitted into evidence what Collister claims is at issue in this motion.

What Collister wants to do in this Court is re-litigate the significance of what he quoted to the Arbitrator.  As the arbitrator stated on the record, it did not favor either side.  Collister disagrees.  But that is not for the Court to decide in reviewing an arbitration award.  Even if the Court was inclined to conduct such a review, there is plenty of evidence showing that there were performance issues with no connection to Collister's alleged disability (ADHD) and that the Arbitrator could think "wow this guy is unreasonable."

At issue in the arbitration was whether Collister's requests for accommodation were reasonable and whether he needed them to perform his job, or whether he was being

unreasonable and trying to get fired so he could sue and get out of his non-compete agreement and work for a competitor. It was undisputed that no doctor, psychiatrist, psychologist, counselor, or other healthcare provider recommended the accommodations requested by Collister. The doctor who diagnosed the ADHD politely refused to sign off on Collister's list of accommodations. He then saw a counsellor, secretly recording the sessions, but could not get her to sign off on the accommodations either. Despite a complete lack of medical support for his request, KXAN granted most of Collister's requests, including a private work space, making one of 20 station vehicles available for him, buying him noise canceling headphones, providing extra assistance from the Executive Producer, and others. Collister asked for a baby monitor so his manager could push a button to get Collister's attention when Collister had his headphones on. KXAN granted the request. Collister never provided anything from a healthcare provider or anyone else indicating that the accommodations were not sufficient.

Collister was not meeting deadlines or getting the "whale" stories on the air, most likely because he was spending time making secret recordings and working on his venture with Nexstar's competitor (TEGNA) which owned KXAN's competitor (KVUE). This came to a head in early September 2017 when Collister got "scooped" on several stories and a KXAN photographer became so frustrated with Collister that he did not want to work with Collister anymore. Frustrations of Chad Cross and other KXAN employees are summarized in numerous emails which were admitted into evidence in the arbitration. There was plenty of evidence to find that Collister was being unreasonable and no testimony is needed from KXAN's counsel.

The undisputed evidence before the arbitrator was that Collister put forth short-lived efforts to fulfill the requirements of a Performance Improvement Plan and ultimately refused to commit to important deadlines. The Arbitrator heard testimony that Collister was seen packing up his personal belongings, saying he would go across the street to KVUE and "kick the

s_ _ t out of KXAN." The Arbitrator had multiple emails laying out Collister's business plan for his competing business as evidence as to why he refused to commit to deadlines for Super Bowl and Olympics stories – he wanted to leave KXAN and wanted out of his non-compete agreement, so he could go to KVUE.  So, the Arbitrator had before her exactly what the quote from the illegal recording refers to – performance issues that were not connected to ADHD and Collister being unreasonable.  There is no need for testimony from an attorney.

### III.
### ARGUMENTS MADE BY ATTORNEYS ARE NOT EVIDENCE

Regardless of whether the alleged quote in Exhibit 43 (which was admitted) or the illegal recording came into evidence, this has nothing to do with the review by this Court following the standard of review allowed by the Federal Arbitration Act.  As can be seen from Exhibit 43, KXAN had counsel engaged prior to Collister's discharge.  Collister did as well.  In fact, Collister quoted his counsel in Exhibit 43, where he also put in bold red and underlined type:

> "**The following statement has been crafted with my attorney Mark Anthony Sanches, who will be representing me at the EEOC and in Arbitration hearings:**
>
> **Chad,**
>
> **You're intentions to fire me because of my disclosure of my disability are incredibly transparent and you continue to discrimination and retaliation.  Your outright lies, mischaracterizations and falsehoods will eventually be proven false and I will be vindicated once you, and others, are deposed under oath and I present my side of the events.**
> **As for your excessively forceful demand that I commit in blood to meeting the deadliens above, my attorney has advised me to respond as follows:**
>
> **"I will do my best to hustle to meet the deadlines.  But as with every investigative story, I am not responsible – nor can I control – the level of cooperation I will encounter from those who are the subject of these stories which may cuase delays beyond my control."**

Collister wanted in evidence what he wrote in Exhibit 43 about his attorney's opinion, and the Arbitrator admitted it.  The bottom line is that the Arbitrator had before her what

both KXAN's attorney allegedly said and what Collister's attorney allegedly said. It was within the Arbitrator's discretion whether or not to give comments from lawyers any weight. As can be seen from the Award, she did not give them any weight and instead focused on the credible evidence. Revisiting what lawyers said is beyond the permissible scope of review in this case.

## IV.
## CONCLUSION

No amount of additional discovery or testimony from attorneys could save Collister's claim. The credible evidence presented at the arbitration hearing proved that Collister had no claim. His bizarre behavior during the hearing such as chewing on a fishing lure and going to the back of the conference room and sleeping during testimony had to have hurt his credibility. Although Defendant's counsel could testify as to his opinions as to why Collister's claim had no merit, none of those opinions fit within the statutory grounds for vacating an arbitrator's award. Collister has failed to articulate how testimony from counsel relates to any of those grounds.

Respectfully submitted,

*/s/ William L. Davis*
William L. Davis, Esq.
State Bar No. 05563800
davisw@jacksonlewis.com
Julie C. Tower, Esq.
State Bar No. 24070756
Julie.tower@jacksonlewis.com

JACKSON LEWIS P.C.
500 N. Akard, Suite 2500
Dallas, Texas 75201
PH: (214) 520-2400
FX: (214) 520-2008

**ATTORNEYS FOR DEFENDANTS**

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing pleading was forwarded to the following Pro-Se Plaintiff via email and certified mail, return receipt requested, on July 12, 2019:

>Brian Collister
>Plaintiff Pro-Se
>295 Desert Willow Way
>Austin, Texas  78737
>Briancollister@yahoo.com

>*/s/ William L. Davis*
>William L. Davis

4819-6422-6716, v. 1